IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL CASE NO. |
| | ) | |
| v. | ) | JUDGE |
| | ) | |
| THE UNIVERSITY OF CHICAGO | ) | |
| | ) | |
| Defendant. | ) | |

**VERIFIED COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff John Doe ("John" or "Plaintiff") through undersigned counsel, files this Verified Complaint pursuant to Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"), the Fair Housing Act ("FHA") 42 U.S.C. §§ 3601-3619, and state law against defendant The University of Chicago ("Defendant" or the "University") seeking injunctive, declaratory, compensatory, and other further relief, and alleges as follows:

**JURISDICTION AND VENUE**

1. This action arises under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX") and the Fair Housing Act ("FHA") 42 U.S.C. §§ 3601-3619.

2. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.

3. This Court has personal jurisdiction over the Defendant because it conducts business within the state of Illinois.

4. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in the Northern District of Illinois.

1

## PARTIES

5. John currently resides in Washington, DC.

6. John is an undergraduate student studying mathematics at the , who has been on the Dean's list and received a 4.0 GPA last quarter, while never having any disciplinary actions against him.

7. John lives in on-campus housing.

8. Defendant is a private university organized and existing under the laws of the State of Illinois, with multiple campuses and centers, including the relevant main campus in Chicago, Illinois, located within this District.

## FACTS

9. This case arises from discrimination based in the University's failure to investigate and address John's multiple complaints of gender and sexuality-based harassment, creation of a hostile educational environment, and retaliation by fellow student, Student 1.[1]

10. Student 1 filed a false housing complaint against John in connection with his campaign of sexuality-based harassment.

11. The University gave John a move-out deadline of Monday, November 7, 2022, at 3:00 PM.

12. The University is taking discriminatory actions by asking John to leave his dormitory in the middle of midterm examinations, despite clear notice that the complaint

---

[1] Third-party students' names have been omitted from this Complaint and Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction filed concurrently with this Complaint to protect the privacy of those students. The object of this Complaint as well as Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction is to allow John to remain in his University housing and to obtain relief from the University, rather than to cause embarrassment or to obtain relief from any other student.

precipitating such removal was retaliation in violation of Title IX, the FHA, and the University's Policy on Harassment, Discrimination, and Sexual Misconduct (the "Title IX Policy").

**I. BACKGROUND**

    **A. Since February of 2022, John Has Experienced Harassment in Violation of Title IX and the University's Title IX Policy.**

13. In or around February of 2022, John began to experience harassment and inappropriate touching by Student 1.

14. Student 1 constantly used hateful slurs against gay men, including "f*ggot" and "f*g."

15. Student 1 also continuously made comments that John, and other gay students are "rapists," and were going to "rape" him, drawing on a harmful and hateful stereotype portraying gay men as sexual predators.

16. John repeatedly told Student 1 to stop these behaviors, to no avail.

17. Since Student 1's harassment began, John considered filing a Title IX complaint with the University pursuant to the procedures outlined in the University of Chicago Policy on Harassment, Discrimination, and Sexual Misconduct (the "Title IX Policy"). *See* **Exhibit 1**, Title IX Policy.

    **B. John and Student 1 were Briefly Involved in a Verbal Altercation on the Evening of September 29-30.**

18. On the evening of September 29-30, John had attended a party.

19. John is 22 years old, 6' tall, and weighs 160 lbs.

20. John had consumed 3-4 light beers at the party and consumed the last drink about an hour and a half to two hours before walking back to his dormitory.

21. John walked back to his dormitory with fellow students, Student 2, and Student 3.

22. While walking into the dormitory, Student 2 and John encountered Student 4, Student 1's roommate.

23. In 2021, Student 2 lived in the room that Student 4 now occupies.

24. Student 2 expressed interest in seeing how Student 4 had set up the room.

25. Student 4 invited Student 2 and John inside to take a look around and offered them food. Student 2 and John were standing in the main room of Student 4's suite.

26. While Student 2, Student 4, and John were speaking to one another in the main room, Student 1 walked out of a bedroom.

27. John embraced Student 1 with a "bro hug," a form of greeting that was common in their prior social interactions.

28. The four students continued to casually speak to each other following the "bro hug."

29. During the conversation, Student 2 stated that Student 1 had behaved inappropriately in the past, including using racial and homophobic slurs.

30. Student 2 threatened to harm Student 1 if Student 1 made derogatory remarks about homosexuality again.

31. This statement led to Student 2 and Student 1 verbally arguing with each other in the hallway of the dormitory, which occurred without any involvement of John.

32. Student 3 witnessed this verbal argument, and stated repeatedly that Student 1 should simply close his door to end the argument.

33. Student 2 stated to Student 1 that people in their shared dormitory "call [Student 1] 'Title IX' for a reason."

34. Student 2 informed Student 1 that John and Student 2 planned to file a Title IX complaint against Student 1 to the University.

4

35. Student 1, with knowledge of Student 2 and John's intent to file a Title IX complaint with the University, filed a false complaint with University of Chicago Housing, falsely alleging that John had violently assaulted him on the night of September 29-30.

## II. HOUSING REMOVAL

### A. John was Subjected to a Disciplinary Process that Violated the University's Policies.

36. The University's Housing & Residence Life Policies & Disciplinary Procedures 2022-2023 (the "Housing Policies," attached as **Exhibit 2**) set forth the basic rights and responsibilities of residents in University housing.

37. The Housing Policies section labeled "Disciplinary Procedures" outlines the disciplinary process for students accused of misconduct in violation of the Housing Policies.

38. The Housing Policies and related procedures were not followed in connection with the investigation of Student 1's complaint regarding the night of September 29-30 (the "Housing Investigation").

39. The Housing Investigation also implicated Title IX and the Title IX Policies, yet the University failed to appropriately respond or investigate, as set forth herein.

#### 1. *John's Initial Meeting Failed to Provide Notice of the Allegations in Violation of the Housing Policies.*

40. The Disciplinary Procedures section reads, "[s]tudents who have been involved in an…alleged policy violation in the residence halls may be required to meet privately with one (or more) of the Directors of Housing & Residence Life (or a Campus and Student Life designee)."

41. The purpose of the initial meeting, according to the Housing Policies, is to:

   a. Verify details in written reports, and offer the student an opportunity to explain what happened[;]

5

  b. Explain the disciplinary process to the student[;]

  c. Counsel the student regarding their conduct and the impact their conduct has had on the student's community[;]

  d. Discuss with the student corrective action being taken, and/or referrals to resources for the student[.]

**Exh. 2**, Housing Policies, "Disciplinary Procedures."

42. John met with the Resident Heads ("RHs") of John's dormitory on October 1, 2022.

43. During John's meeting with the RHs, the RHs failed to adhere to the steps outlined in the Disciplinary Procedures requiring discussion of the alleged conduct, providing detailed notice of the accusations, and of the particulars of the allegations.

44. During the initial meeting, John explained his interaction with Student 1 on the evening of September 29-30, 2022, categorically denying any allegation of physical violence or threat.

45. On October 1, 2022, at 4:07 PM, John received a no-contact directive prohibiting Student 1 and John from interacting with one another. *See* **Exhibit 3**, No Contact Directive.

46. During the entirety of the University's investigation into the events of September 29-30 (the "Housing Investigation"), John was not informed of the totality of the allegations against him.

47. John only became aware of several of the allegations upon receipt of an October 24, 2022, outcome letter. *See* **Exhibit 4**, October 24, 2022, Outcome Letter.

48. Specifically, John was not previously aware of the following allegations:

  a. Allegations that John had forced his way into Student 1's room;

  b. Allegations that John refused to leave Student 1's room when asked; and

6

      c. Allegations that there were other expanded conversations during John and Student 1's interaction that were not provided to John.

**Exh. 4**, Outcome Letter.

49. Without notice of the allegations against him, John was unable to competently defend himself against Student 1's allegations.

50. The Outcome Letter informed John that he was to be removed from his dormitory by October 31, 2022, (the following Monday).

### 2. *John's Only Identified Witness was Not Interviewed.*

51. John identified Student 3 to Jessica Beaver as a witness to his interactions with Student 1 on September 29-30.

52. Student 3 was not interviewed in connection with the Housing Investigation prior to the conclusion of the Housing Investigation and John's receipt of the Outcome Letter.

53. Upon information and belief, each witness identified by Student 1 was interviewed in connection with the Housing Investigation.

54. Without critical context from Student 3, the Housing Investigation was incomplete and uninformed.

### B. John Reported Student 1's Title IX Harassment and Retaliation to the University, and the University Failed to Respond or Investigate.

55. On October 6, 2022, prior to any actual notice of Student 1's allegations in connection with the Housing Investigation, John reported Student 1's harassment and retaliation to Jessica Beaver, Senior Assistant Director of Residence Life.

56. In his communication to Jessica Beaver, John outlined Student 1's prior sexuality-based harassment in violation of Title IX and the Title IX Policy, as well as Student 1's motive to

7

retaliate against John for availing himself to the University's Title IX office. *See* **Exhibit 5**, Message from John Doe to Jessica Beaver on Thursday, October 6, 2022, at 5:00 PM.

57. John then emailed Scott Velasquez, Executive Director of the Office for Equal Opportunity and Access and Deputy Title IX Coordinator, on October 25, 2022. *See* **Exhibit 6**, Email from John Doe to Scott Velasquez, Tuesday, October 25, 2022, at 12:54 PM.

58. John next spoke with Robin Berman, Associate Director of Response & Support Services, on October 25, 2022, at approximately 3:45 PM, about his complaints of Title IX harassment and retaliation.

59. Ms. Berman indicated that she had not been informed of any Title IX infractions prior to October 24, 2022, more than two weeks after John's initial report to Ms. Beaver.

### C. John Submitted a Housing Appeal Outlining Procedural Errors and Evidence of Title IX Retaliation and Violation of University Policies, and the Appeal was Promptly and Improperly Denied.

60. On October 27, 2022, John submitted an appeal of the Outcome Letter in accordance with the Housing Policies section labeled "Review Process (Appeals)." **Exhibit 7**, October 27, 2022, Housing Appeal.

61. The Housing Appeal outlined the procedural errors in the Housing Investigation, new evidence in the form of testimony from Student 3, as well as issues of Title IX retaliation that are inextricably related to the Housing Appeal. *See id.*

62. The Housing Appeal requested that the housing removal be overturned and that any change in John's housing situation be stayed pending a full, fair, and thorough Title IX investigation.

63. Rather than investigating the clear Title IX retaliation at issue, the University promptly and improperly denied John's appeal. **Exhibit 8**, Email from Kathleen A. Forde to John Doe on October 31, 2022, 4:58 PM.

64. John's revised deadline to be removed from his dormitory, amidst make-up midterm examinations, projects, preparation for finals as well as graduate school applications, and with no alternative housing yet secured, is November 7, 2022, at 3:00 PM.

## COUNT I
### Title IX Hostile Educational Environment

65. John hereby incorporates all preceding paragraphs as if fully reproduced herein.

66. Title IX prohibits sexual harassment and sex discrimination in connection with educational programs and activities that receive federal funding. *See* 20 U.S.C. § 1681(a).

67. Defendant is a recipient of federal funding at least through its receipt of student federal financial aid funds, and is subject to the provisions outlined in Title IX. *See id*.

68. The University was on notice of John's complaint against Student 1 of harassment and retaliation in violation of Title IX and the Title IX Policy at least as early as October 6, 2022. *See* **Exh. 5**, Correspondence from John Doe to Jessica Beaver, October 6, 2022, at 5:00 PM.

69. The University exhibited deliberate indifference to John's Title IX complaints in continuing to adjudicate Student 1's housing complaint with knowledge of Student 1's prior harassment and motive to falsify his report of violence.

70. The University's deliberate indifference has resulted in its erroneous and premature decision to remove John from his housing during midterm examinations and with no alternative housing arrangements.

71. John has experienced materially adverse consequences in his educational experiences in relation to the University's failure to investigate and act upon his Title IX

9

complaints, including, but not limited to, reputational harm, significant distraction and interruption of his midterm examination preparation, in addition to the loss of his only residence.

## COUNT II
## Gender Discrimination in Violation of Title IX

72. John hereby incorporates all preceding paragraphs as if fully reproduced herein.

73. Title IX prohibits sexual harassment and sex discrimination in connection with educational programs and activities that receive federal funding. *See* 20 U.S.C. § 1681(a).

74. Defendant is a recipient of federal funding at least through its receipt of student federal financial aid funds and is subject to the provisions outlined in Title IX. *See id.*

75. According to 86 FR 32637 – Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, Title IX protects all students, including students who are lesbian, gay, bisexual, and transgender, from harassment and other forms of sex discrimination.

76. The University failed to promptly respond to John's complaint of sexual harassment because he is a male, while the University promptly and thoroughly investigates similar complaints by female students.

77. The University promulgates annual compilations of statistics regarding the investigation and resolution of complaints of, *inter alia*, harassment and discrimination. *See* **Exhibit 9**, Reports of Harassment, Discrimination and Sexual misconduct Involving UChicago Students, 2015-2020.

78. Upon information and belief, the proportion of complaints by male and female students are skewed in favor of investigating and adjudicating complaints made by female students with greater speed and with greater sanctions for respondents in such cases.

79. As a result of the University's failure to act to address John's Title IX complaints, John has experienced materially adverse consequences in his educational experiences in relation to the University's failure to investigate and act upon his Title IX complaints, including, but not limited to, reputational harm, significant distraction and interruption of his midterm examination preparation, in addition to the impending loss of his only residence.

## COUNT III
### Title IX Retaliation

80. John hereby incorporates all preceding paragraphs as if fully reproduced herein.

81. Title IX prohibits sexual harassment and sex discrimination in connection with educational programs and activities that receive federal funding. *See* 20 U.S.C. § 1681(a).

82. Defendant is a recipient of federal funding at least through its receipt of student federal financial aid funds, and is subject to the provisions outlined in Title IX. *See id.*

83. John engaged in protected activity under Title IX by (i) stating his intention to file a Title IX complaint against Student 1; and by (ii) lodging Title IX complaints to University personnel.

84. The University participated in retaliation against John for his protected activity by attempting to remove him from his on-campus housing while on notice of evidence that the underlying housing complaint was falsely filed in retaliation for John's stated intent to avail himself to the Title IX office of the University.

85. The University rewarded and encouraged gender and sexuality-based harassment of John through its complicity and participation in attempts to remove John from his housing.

86. John's impending removal from University housing is a material adverse action against him that will deprive him of access to on-campus housing as an education-related benefit of being a student at the University.

11

87. John's housing removal would serve to dissuade a reasonable student from availing himself or herself to the Title IX process at the University.

88. John's wrongful impending removal from his housing during midterm examinations and with no alternative housing arrangements, where the underlying complaint precipitating such removal is motivated by the intent to prevent John from availing himself to the Title IX office, and constitutes retaliation.

89. John is experiencing materially adverse consequences in his educational experiences in relation to the University's failure to investigate and act upon his Title IX complaints, including, but not limited to, reputational harm, significant distraction, and interruption of his midterm examination preparation, in addition to the impending loss of his only residence.

## COUNT IV
### Violation of the Fair Housing Act ("FHA") 42 U.S.C. §§ 3601-3619

90. John hereby incorporates all preceding paragraphs as if fully reproduced herein.

91. The University acted as a landlord in connection with its provision of housing to John in exchange for payment.

92. John put the University on notice of severe and pervasive tenant-on-tenant harassment in the form of sexual-orientation-based harassment by Student 1 in connection with John's protected status under the FHA as a homosexual man.

93. The University was on notice that Student 1's harassment of John was both severe and pervasive.

94. The University was on notice that Student 1's harassment of John was marked by severe episodes, in which he would make comments implying or directly stating that John is a rapist because he is gay.

95. The University was on notice that Student 1's harassment was a relentless pattern, reoccurring each time John and Student 1 interacted.

96. Student 1 was under the disciplinary authority of the University at all times during his harassment of John.

97. The University has several other options short of removing John altogether, including finding substitute housing.

98. The University had the capability to use both incentives and sanctions to alter Student 1's behavior with regard to his harassment of John but chose not to employ them. *See* **Exh. 2**, Housing Policies.

99. The University failed to take reasonable steps within its control to stop Student 1's harassment, by, *inter alia*, failing to investigate or address John's complaints of harassment, failing to investigate or address John's Title IX complaint, and by attempting to evict John from his dormitory despite notice that the complaint precipitating the eviction was retaliatory and motivated by the exercise of John's rights pursuant to Title IX.

100. The aforementioned failures to act demonstrate the University's deliberate indifference toward the resident-on-resident discrimination and harassment of which the University was aware.

## COUNT V
### Breach of Contract, Housing Policies

101. John hereby incorporates all preceding paragraphs as if fully reproduced herein.

102. John and the University entered into a contractual relationship wherein John paid tuition in exchange for educational and related services.

103. The Housing Policies were incorporated as part of the contract between John and the University outlining specific rights and duties as to each party to the contract. *See* **Exh. 2**, Housing Policies.

104. The University breached the contract by, *inter alia*:

   a. Failing to inform John of the complete allegations against him before the review was completed;

   b. Not allowing John to review witness statements and evidence relied upon in connection with the housing review;

   c. Failing to act after learning of John's complaints of Title IX harassment and retaliation by Student 1;

   d. Participating in Student 1's efforts of retaliation by proceeding in removing John from housing without investigating John's complaints of Title IX harassment and retaliation; and

   e. Failing to consider less restrictive alternatives to removal.

105. John performed all duties owed under the contract between himself and the University by timely paying tuition and abiding by University policies, including the Housing Policies.

## COUNT VI
### Breach of Contract – Title IX Policies

106. John hereby incorporates all preceding paragraphs as if fully reproduced herein.

107. John and the University entered into a contractual relationship wherein John paid tuition in exchange for educational and related services.

108. The Title IX Policy was incorporated into the contractual relationship between John and the University. *See* **Exh. 1**, Title IX Policy.

109. The Title IX Policy expressly covers "misconduct that occurs…on University property…or [where] conduct has or reasonably may have the effect of creating a hostile educational or work environment for a member of the University community." *See id*.

110. The Title IX Policy also states that the University "does not discriminate on the basis of race, color, religion, sex, sexual orientation, gender identity, national or ethnic origin, age, status as an individual with a disability, protected veteran status, genetic information, or other protected classes under the law." *See id.*

111. The Title IX Policy defines harassment as "a form of unlawful discrimination [including] verbal conduct, physical conduct, or conduct using technology that is based on a protected class and is so severe or pervasive that is has the purpose or effect of unreasonably interfering with an individual's work performance or educational program participation, or that creates an intimidating, hostile, or offensive work or educational environment." *See id*.

112. The Title IX Policy defines sexual harassment as "any (i) unwelcome sexual advances or unwelcome conduct of a sexual nature; (ii) requests for sexual favors or conduct of a sexual nature when…such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment[.]" *See id*.

113. The Title IX Policy specifies that "[r]etaliation against anybody who makes a complaint or raises a concern about a possible policy violation is prohibited." *See id*.

114. The Title IX Policy specifies that "[v]iolations of [the Title IX] Policy may result in discipline[.]"

115. The Title IX Policy specifies that "Individuals with Reporting Responsibilities" include "University employees" who must "promptly notify the Title IX Coordinator for the

University [with] all known details related to a possible incident of sexual misconduct (including sexual harassment)…that is reported to them directly, indirectly, or through a third party, or that they may have observed. Individuals with Reporting Responsibilities must report such information regardless of where the incident occurred. Individuals with Reporting Responsibilities include (among others) faculty and instructors, RAs, Resident Heads, Resident Deans, TAs, preceptors, UCPD staff, and other university employees."

116. The University breached its contractual obligations pursuant to the Title IX Policy when, *inter alia*, it:

   a. Failed to act when multiple University employees were on notice of Student 1's prohibited harassment and sexual harassment of John in violation of the Title IX Policy;

   b. Failed to act when multiple University employees were on notice of Student 1's retaliation against John in violation of the Title IX Policy.

117. John performed all duties owed under the contract between himself and the University by timely paying tuition and abiding by University policies, including the Title IX Policy.

**WHEREFORE**, John respectfully requests that this Court:

(A) Enter injunctive relief against Defendant to refrain from causing John to leave his residence;

(B) Award damages in an amount sufficient to compensate John for his emotional distress damages, the loss of academic progress and performance and reputational damage caused by Defendant's wrongful actions, in an amount to be determined at trial;

16

(C) Award court costs and other reasonable expenses incurred in maintaining this action; and

(D) Award reasonable attorney fees pursuant to Title IX of the Educational Amendments Act of 1972; and

(E) Award any such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 39.

## 65(B)(1)(b) CERTIFICATION

Plaintiff has provided actual notice to Defendants as of the time of making this application, and provided copies of all pleadings and papers filed in this action to date pursuant to Fed. R. Civ. P. 65(B)(1)(b).

Respectfully submitted,

**LAW OFFICES OF STEVEN H. FINE**

*/s/ Steven H. Fine*
STEVEN H. FINE
53 W. Jackson Blvd., Suite 1215
Chicago, Illinois 60604-3631
Telephone: (312) 922-0855
steve@sfinelaw.com
ARDC 6224908

**KOHRMAN JACKSON & KRANTZ LLP**
SUSAN C. STONE (OH 64445)*
KRISTINA W. SUPLER (OH 80609)*
1375 East Ninth Street, 29th Floor
Cleveland, Ohio 44114-1793
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
Email: scs@kjk.com; kws@kjk.com
*Pending motion for admission *pro hac vice*
*Counsel for Plaintiff John Doe*

17

## VERIFICATION

I, █████████████████████████, first being duly sworn, declare as follows:

1. I am the Plaintiff in the present case and a citizen of the state of Illinois and the United States of America.

2. I have personal knowledge of my activities, my experiences, and my intentions, including those set forth in the foregoing Verified Complaint, and if called upon to testify I would competently testify as to the matters stated in this Verified Complaint.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct to the best of my knowledge. 28 U.S.C. § 1746.

SUBSCRIBED AND SWORN BEFORE ME THIS 3 DAY OF NOVEMBER 2022



NOTARY PUBLIC

My commission expires: 12/31/22

Registration No. _____

OFFICIAL SEAL
LATASHA CASTILE
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires Dec. 31, 2022