**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:22-cv-06105 |
| | ) | |
| v. | ) | |
| | ) | Acting Emergency Judge |
| THE UNIVERSITY OF CHICAGO, | ) | Edmond E. Chang |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION & ORDER**

A senior-year undergraduate student at the University of Chicago, Plaintiff John Doe,[1] filed this suit against the University. He presents claims under Title IX and the Fair Housing Act (FHA), as well as state-law claims.[2] R. 2, Compl. at 1.[3] John Doe concurrently moved for a temporary restraining order (TRO) to temporarily prevent the University from requiring him, as of November 7 at 3 p.m., to move out of his on-campus housing and from prohibiting him from entering any other residence halls and dining commons for the rest of the academic year 2022–23. R. 4, Mot. TRO. For the reasons detailed below, John Doe's TRO motion is granted for a 14-day period, from November 4, 2022, through November 18, 2022.

---

[1] John Doe has filed a motion to proceed under a pseudonym and to label other case participants with pseudonyms. R. 5, Mot. Proceed Under Pseudonym. This motion is continued for the assigned judge's later consideration, so pseudonyms remain in place for now and will be used in this Opinion and Order.

[2] This Court has subject matter jurisdiction over the Title IX and FHA claims under 28 U.S.C. §§ 1331, 1343, and over the state-law claims under 28 U.S.C. § 1367.

[3] Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

## I. Legal Standard

The test for obtaining a TRO is the same as that for a preliminary injunction, with the added requirement that the movant's opponent cannot practically be given a full opportunity to respond. Fed. R. Civ. P. 65(b)(1)(A). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). The moving party must show: "(1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) that an irreparable harm will result if the injunction is not granted." *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007) (cleaned up).[4] If the moving party meets these requirements, then the court balances the nature and degree of the potential harm to each party and the public interest. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

## II. Analysis

John Doe's Complaint includes six counts: hostile educational environment, gender discrimination, and retaliation, all three under Title IX, 20 U.S.C. § 1681(a), violation of the FHA, 42 U.S.C. §§ 3601-3619, and two counts of state-law breach of contract. Compl. ¶¶ 65–117. For purposes of this TRO analysis, the Court focuses on Count 1, which alleges a hostile educational environment in violation of Title IX's

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

prohibition against sex discrimination. There is enough of a likelihood of success on Count 1 to justify entry of the TRO, so there is no need to analyze the other claims.

### A. Likelihood of Success

The first step in the TRO analysis requires John Doe to "demonstrate that his claim has some likelihood of success on the merits, not merely a better than negligible chance." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (cleaned up). In assessing the merits, the Court reviews the current record from a "neutral and objective viewpoint" without accepting John Doe's allegations as true nor drawing all reasonable inferences in his favor. *Id.* at 791–92. With that said, John Doe is the only side that has presented evidence (in the form of the Verified Complaint and exhibits), so naturally the evidence is stacked in his favor. Obviously, as the litigation moves past the initial TRO stage, the University will have an opportunity to submits its own evidence and this Opinion ought to be read in this early procedural context.

Marching on to the merits analysis, a Title IX sex discrimination claim requires that (1) the educational institution received federal funding, (2) the plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against the plaintiff based on sex, which includes sexual orientation. *Id.* at 792; *see Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741 (2020) (holding in the Title VII context that "it

is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex").[5]

When solely considering *injunctive* relief and not monetary damages, the Court does not take the extra step of requiring proof of notice of sex discrimination to an appropriate person with the authority to institute corrective measures who, in addition, was deliberately indifferent to the plaintiff's discrimination allegations.[6] *See C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 540 (7th Cir. 2022) ("In *Gebser v. Lago Vista Independent School District*, the Supreme Court held that a victim of such discrimination may recover *money damages* from her school only where an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct.") (cleaned up) (emphasis added). Instead, the Court evaluates "the totality of the circumstances" to evaluate whether there is some likelihood of success on the merits, not merely a better than negligible chance, that John Doe

---

[5]At least at this early stage of the case, the University does not appear to contest that sex discrimination under Title IX includes sex discrimination on the basis of sexual orientation.

[6]Even if it were necessary to consider whether John Doe gave notice of sex discrimination to a person with authority to institute corrective measures, John Doe did inform Jessica Beaver, Senior Assistant Director of Residence Life, on October 6, 2022, that on multiple occasions Student 1 had allegedly used egregiously offensive language in relation to John Doe's sexual orientation. R. 2-5, Oct. 6, 2022 Email. Beaver is most likely—along with the Resident Heads that John Doe spoke to on October 1, Compl. ¶ 42–44—an employee with Title IX mandatory reporting responsibilities under the University's policy. *See* R. 2-1, Title IX Policy at 20. So, John Doe likely did provide notice of sex discrimination to at least one, and maybe more, individuals within the University with authority (and responsibility) to institute corrective measures, like informing the Title IX office. What's more, there is no evidence that Beaver timely informed the Title IX office. This failure to act is enough evidence of deliberate indifference for the purpose of issuing temporary injunctive relief to preserve the status quo.

suffered sex discrimination by the University of Chicago. *See Doe v. Univ. of S. Indiana*, 43 F.4th at 792 (evaluating propriety of preliminary injunction without any analysis of notice to an appropriate person who was deliberately indifferent).

With the right test in place, the Court now turns to the three relevant elements to consider. First, the University of Chicago receives federal funding. Compl. ¶ 67. Second, absent an injunction, John Doe would be excluded from benefits of an educational program—he would be banned from on-campus housing, all residential halls, and dining commons for the rest of the academic year. R. 2-4, Outcome Letter; R. 2-8, Appeal Denial; R 2-9, Move Out Instructions. So, the third element of the Title IX sex discrimination test is the only one in dispute. And, with the evidence available, the Plaintiff has shown some likelihood that the University engaged in sex discrimination—at least enough so that a TRO is appropriate to preserve the status quo.

Specifically, based on the current record, the University seems to have failed to account for the alleged sexual-orientation harassment of John Doe by Student 1 when the University conducted its investigation into the accusations leveled by Student 1 against John Doe. The housing-disciplinary process got started when Student 1 complained to on-campus housing authorities that John Doe physically attacked Student 1 on the night of September 29–30. But John Doe avers that this false accusation was leveled only after John Doe and another student, Student 2, threated Student 1 with filing Title IX complaints against Student 1 for alleged homophobic

5

comments and behavior. Compl. ¶¶ 34–35.[7] Yet neither the October 24 Outcome Letter nor the October 31 appeal denial mention any *investigation* of Student 1's alleged discrimination against John Doe, which naturally would provide a motive to fabricate the physical-attack accusation. Outcome Letter; Appeal Denial; Oct. 6, 2022 Email. The Outcome Letter only mentioned that John Doe reported prior "issues" with Student 1 but dismissed these issues as "more related to language that [Student 1] used toward members of the LGBTQIA+ community," as distinct from the supposed violence of September 29–20. But it is not that easy to cabin the alleged sexual-orientation from the housing-discipline allegation, given the potential motive to fabricate and the alleged timing of Student 2 and John Doe's potential Title IX complaint against Student 1. Worse, the appeal denial was even more perfunctory; it affirmed the Outcome Letter with no actual explanation for why John Doe's contentions of procedural irregularity and missed evidence were insufficient grounds for the appeal. Appeal Denial. The appeal denial boils down to ipse dixit without articulated reasoning.

At the November 4, 2022 telephonic hearing held on John Doe's TRO motion, the University argued that John Doe's alleged attack of Student 1 should be considered entirely independently of John Doe's Title IX accusations against Student 1. To

---

[7]John Doe averred to his "Verified Complaint," meaning that the Court can rely on the facts alleged as if they were contained in an affidavit. Generally, the Rules of Evidence do apply to preliminary-injunction hearings. *See* Fed. R. Evid. 1101 (no exception for preliminary-injunction hearings). But affidavits are admissible at such hearings because Federal Rule of Civil Procedure 65 hearings are summary in nature and less formal than trials. *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997); *see also Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010). Hearsay too is admissible. *SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991).

6

the University's thinking, the punishment of John Doe was appropriate given the alleged physical attack on September 29–30, even without considering any alleged prior sex discrimination perpetrated by Student 1. But the University also acknowledged—as it must—that what happens *before* an alleged physical attack is relevant to determining whether the alleged attack is even true. In other words, it makes good sense that a person, like Student 1, who is threatened with a discrimination complaint might harbor some motivation to preempt his accuser with, for example, a false allegation. To be clear: the Court is most certainly *not* opining on the truthfulness of Student 1's accusations against John Doe. The accusations might very well be true, and if they are, then nothing at all would prohibit the University from implementing the housing-and-dining ban on John Doe. But the University's apparent total failure to consider the sex-discrimination motive on the part of Student 1 qualifies as ignoring the University's potential participation in Student 1's discrimination. (And, if needed to prevail for a TRO, qualifies as deliberate indifference to John Doe's claim of sex discrimination.)

Relatedly, at the November 4 hearing, the University explained that, for purposes of its investigation into John Doe's behavior, it did not interview the witness (Student 3) who John Doe identified to corroborate Doe's version of events on the night of the alleged attack. Apparently, the University only interviewed John Doe's corroborating witness, Student 3, as part of *another* student's disciplinary proceeding and not at all before it made its decision to ban John Doe from on-campus housing and dining. The Outcome Letter and the appeal-denial letter also do not explain why

7

the University chose not to interview Student 3. Indeed, the letters do not *mention* Student 3 at all. Outcome Letter; Appeal Denial. The failures by the University to interview Student 3 and to provide any explanation for that decision constitute more circumstantial evidence favoring John Doe's sex-discrimination claim.

To emphasis again: it is not a federal court's role to supplant any genuine party-credibility or witness-credibility determinations made by the University. Indeed, the situation would be different if the record showed (and it might later in the case) that the University had weighed the totality of the evidence available—including Student 1's possible discriminatory motive and John Doe's corroborating witness. Instead, for reasons unexplained, it appears that the University undertook an incomplete investigation, without the benefit of learning about the past interactions between John Doe and Student 1 or the perspective of John Doe's identified witness. If there was a proper reason for this limited approach, the University does not provide it in the Outcome Letter or the appeal denial. And finally, in its investigation, the University also inexplicably did not advise John Doe of all the allegations that Student 1 levelled against him until after it issued its decision in the Outcome Letter. Compl. ¶¶ 46–49. Again, the University does not provide an explanation for this lack of transparency, which also counts in favor of John Doe's claim of discrimination. And so—again, based on the totality of the circumstances right now and without the benefit of full adversarial presentation at this stage—there is some likelihood of success on the sex-discrimination claim.

8

### B. Inadequate Remedy at Law and Irreparable Harm

Next, the Court considers whether a TRO is necessary to prevent irreparable harm that cannot be "fully rectified by the final judgment after trial." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (cleaned up). "Not every conceivable injury entitles a litigant to a preliminary injunction," *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005), and "issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (cleaned up); *see also E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) ("For example, speculative injuries do not justify this extraordinary remedy.").

John Doe argues that he would suffer irreparable harm by losing his on-campus housing, as well as access to all other residence halls and dining commons for the rest of the year. R. 4, Pl.'s Br. at 10–11. At the November 4 TRO hearing, John Doe testified that he is in the midst of completing several academic assignments due in the coming weeks—one of which is for his key recommender for graduate school—and also completing mathematics graduate-school applications, some of which are due in November and December. He also testified that finals for the term are upcoming. At the time of the November 4 TRO hearing, John Doe would have had one weekend to move out of his housing by November 7 at 3 p.m. Move Out Instructions. It is unclear whether John Doe enjoys the financial means to find an alternative home over a

9

weekend, or whether he would be left without a place to live; homelessness, even for a short while, would constitute irreparable harm. But even if John Deo could financially handle a quick move, he still faces imminent harm that could not be rectified with monetary damages. Specifically, John Doe testified to crucial and immediately upcoming academic and professional deadlines in the form of important assignments, graduate school applications, and final examinations. The negative impact of failure on those upcoming assignments, applications, and tests because of a near-term eviction from on-campus housing and an inability to access social and study opportunities with students in other residence halls and dining commons is an irreparable harm for which no adequate remedy at law exists.[8]

---

[8] At the November 4 TRO hearing, the University cited cases in which plaintiffs were suspended or expelled from school to argue that John Doe will not suffer irreparable harm as a result of his removal and ban from on-campus residential and dining life. But the cases do not establish that proposition as a matter of law. Rather—aside from mostly being non-binding authority—the cases showcase particularized analyses of the facts, circumstances, and alleged harms specific to each case before rejecting irreparable harm. *See Doe v. Univ. of S. Indiana*, 43 F.4th (denying a preliminary injunction solely based on a lack of a likelihood of success on the merits, not because of irreparable harm); *Doe v. Bd. of Trustees of Univ. of Illinois*, 2017 WL 11593304 (C.D. Ill. Dec. 18, 2017) (denying a preliminary injunction based on the specific facts and circumstances that showed that plaintiff's harms were reparable by monetary judgment); *Medlock v. Trustees of Indiana Univ.*, 2011 WL 4068453 (S.D. Ind. Sept. 13, 2011) (same); *Montague v. Yale Univ.*, 2017 WL 4942772 (D. Conn. Mar. 8, 2017) (finding based on the vagueness and lack of immediacy of the plaintiff's supposed harms that the expulsion could be adequately remedied by money damages if the plaintiff was proven right). The University also cited a Second Circuit district court case, *Greer v. Mehiel*, which explains that in that Circuit evictions typically constitute irreparable harm when they also involve the risk of homelessness, because otherwise they can be remedied later through monetary judgment. 2016 WL 828128 (S.D.N.Y. Feb. 24, 2016). Aside from being non-binding, this case does not help address the irreparable harm to John Doe's immediate academic and professional objectives.

### C. Balance of Harms and Public Interest

Having determined—at this stage and without full adversarial presentation—that John Doe has shown some likelihood of success on the merits and that he is likely to suffer irreparable harm, the Court, "sitting as would a chancellor in equity," now balances the risks of harm to the Plaintiff and Defendant, as well as the public interest (if any). The Court's goal in this is to "minimize the costs of being mistaken" by "weigh[ing] the competing considerations [to] mold appropriate relief." *Stuller*, 695 F.3d at 678 (cleaned up). The harms to John Doe have already been detailed: he will lose his on-campus housing and access to other student residences and dining halls, negatively affecting his near-term academic and professional work. The University of Chicago, on the other hand, of course has an interest in protecting its other students, namely, Student 1 who accused John Doe of a physical attack. Student 1's safety constitutes a serious and intense interest.

The University has already issued a no-contact directive prohibiting contact between John Doe and Student 1 at all University of Chicago locations. R. 2-3, No-Contact Directive. John Doe asserts that the no-contact directive has worked until now, with neither of the two students having interacted since its issuance. Pl.'s Br. at 11. At the TRO hearing, the University acknowledged that it was not aware of any violations. For the time being, then, the no-contact directive seems to be working as a reasonable compromise of the parties' competing interests. And nothing in this order prevents the University from strengthening the no-contact directive to minimize

11

inadvertent contact by, for example, examining each student's schedule to provide further direction to each about places and times to avoid.

Here, the public interest does not favor one or another party. And so, the current effectiveness of the no-contact directive, which can be strengthened further, tips the equitable scales in favor of allowing John Doe to temporarily remain in his on-campus housing with access to other residence halls and dinning commons.

### III. Conclusion

For the reasons discussed in this Opinion, John Doe's TRO motion is granted from November 4, 2022,[9] through November 18, 2022. The University is barred from enforcing the October 24 and October 31 directives to move out of the residence hall and barred from enforcing the October 24 and 31 ban from Housing and Residence Life halls and dining commons. This order binds the following persons with actual notice of the order: the University's officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with those listed categories of individuals.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 7, 2022

---

[9] The Court posted a summary version of this Order on November 4, 2022. R. 17.